

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00371-CV

———————————————

IN THE INTEREST OF R.H., A CHILD

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV22-00314

Before Kerr, Birdwell, and Bassel, JJ.
Opinion by Justice Birdwell

# OPINION

## I. Introduction

The Texas Department of Family and Protective Services filed a petition to terminate the parental rights of M.R. (Mother) and C.H. (Father) to their child, Robert.[1] Robert's paternal grandmother and paternal step-grandfather (the Sandersons) filed a petition in intervention. Before trial, the Sandersons filed an amended petition asking for termination of both parents' rights. The Department asked for a nonsuit before trial, but that request was denied by the trial court.

Following a bench trial, the trial court terminated both parents' rights to Robert.[2] The court specifically found that Mother had engaged in conduct that endangered Robert, that she had failed to comply with the provisions of the court-ordered service plan, and that termination was in Robert's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O), (b)(2). In addition, the trial court found pursuant to the Indian Child Welfare Act (ICWA) that—beyond a reasonable doubt—the Department had engaged in active efforts to prevent the breakup of an Indian family and that the evidence (including expert testimony) demonstrated that continued custody by the parents was likely to result in serious emotional or physical damage to Robert. *See* 25 U.S.C. § 1912(f).

---

[1]As this is a parental rights termination case, we use aliases to refer to the children, parents, and grandparents involved. *See* Tex. R. App. P. 9.8(b)(2).

[2]Father does not appeal.

Mother raises two points. First, she argues that the trial court impermissibly employed standards from both ICWA and the Texas Family Code in making the findings in this case. Second, she claims that the evidence is both legally and factually insufficient to support the trial court's predicate conduct and best interest findings under the Family Code.

We affirm.

## II. Background

Robert was born in August 2022. The Department became involved with him soon after his birth, and Robert was removed from his parents' custody within a few days—before leaving the hospital—because there was reason to believe that there was neglectful supervision of Robert by Mother. Specifically, both Mother and Robert had tested positive for benzodiazepines. Robert was placed with the Sandersons. Lorrie Schofield was the assigned caseworker.

Schofield determined that Father was a member of a federally recognized Indian tribe. Members of the tribe were notified of Robert's removal and were present at the hearing on initial temporary orders. Although Mrs. Sanderson is not a member of the tribe, her ex-husband (Robert's paternal grandfather) is.

Mother received a service plan obliging her to maintain stable employment and housing, not to engage in criminal activity, to undergo a drug and alcohol assessment, to participate in random monthly drug testing, and to engage in relationship and parenting counseling. Schofield was Mother's caseworker from August 2022 to May

2023. She testified that, from August until May, Mother was unable to maintain stable employment. The only proof of employment that Mother provided Schofield was a pay stub for working two shifts at Taco Bell in February 2023. As for housing, Mother had moved in with an older friend.

The Sandersons had taken Robert to live in southeast Texas. For visits, they would drive to Gainesville once a month and to Waco once a month for Robert to see Mother. The visits began in October 2022. Mother missed her visits in January and February 2023. The trial court thereafter suspended any visitation between Mother and Robert until Mother demonstrated that there was active engagement "in services and drug tests."

The service plan also obligated Mother to complete a drug and alcohol assessment. She did so, and she was recommended to complete intensive outpatient rehabilitation for substance abuse. Mother began attending this program in December 2022 but was unsuccessfully discharged on April 5, 2023. Mother was also required to attend Narcotics Anonymous, but by February 2023, she stopped sending the Department proof of her attendance. Mother was compliant with court-ordered drug testing until February 2023. However, she failed to submit to that test and several subsequent tests. From March onward, the Department received no drug test results from Mother.

The Department agreed with Mother that she should "focus on mental health and substance abuse services" before taking required parenting classes. However,

4

because she never completed the mental health and substance abuse portions of her services, she never completed parenting classes. Mother also failed to complete the stipulations required to participate in domestic violence intervention services.

Having had six previous children, Mother had an extensive history of six prior cases with the Department. Schofield was Mother's caseworker for another of her children, D.T. The case with D.T. was still pending when Robert was born. After Mother and Robert tested positive for drugs, Mother sent Schofield a photograph of a prescription bottle for benzodiazepine. But Schofield knew Mother's prior history, knew she had a pattern of failing to comply with drug testing, and knew that Mother had misused prescription drugs previously. According to Schofield, Mother failed to comply with her service plan, failed to demonstrate that she could provide a safe and stable home for Robert, and failed to take any steps to ensure a relationship with Robert.

The tribal specialist and representative testified that Robert would likely be subject to serious emotional or physical injury if returned to either parent and, in response to a question about whether termination was in Robert's best interest, she answered that the tribe was "in agreement with termination." She also testified that the tribe approved of Robert's placement with the Sandersons and that she had no concerns about ICWA in the case. One of Mother's caseworkers testified at trial that the Sanderson residence was an "Indian home," that the Sandersons would provide "cultural activities to familiarize [Robert] with his [Native] American heritage and

5

culture," and that they would be "able to on an ongoing basis . . . reach out to the tribe if they would like to get more information and bring that into their home." The Sandersons planned to have Robert involved with his paternal grandfather on "an almost . . . weekly, monthly basis." Robert's paternal grandfather testified that he had no complaint with "the job [the Sandersons were] doing with" Robert, and he was comfortable that the Sandersons would "continue to make [Robert] available to [him] and to [Robert's] siblings."

## III. ICWA Finding

In her first point, Mother argues that the trial court erred by applying the parental rights termination standard found in the Family Code in addition to that contained in ICWA. We reject Mother's argument.

### A. ICWA and the Family Code

In 1978, the United States Congress enacted ICWA out of concern that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 U.S.C. § 1901(4). Congress found that many of these children were being "placed in non-Indian foster and adoptive homes and institutions" and that the states had contributed to the problem by "fail[ing] to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(4), (5); *Haaland v. Brackeen*, 599 U.S. 255, 265, 143 S. Ct. 1609, 1623 (2023). The protection of the tribal interest is at the core of ICWA,

6

which recognizes that the tribe has an interest in the child that is distinct from, but on a parity with, the interest of the parents. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52, 109 S. Ct. 1597, 1610 (1989)).

ICWA aims to keep Indian children connected to Indian families. *Haaland*, 599 U.S. at 265, 143 S. Ct. at 1623. If an Indian child lives on a reservation, ICWA grants the tribal court exclusive jurisdiction over all child custody proceedings, including adoptions and foster care proceedings. *See* 25 U.S.C. § 1911(a); *Haaland*, 599 U.S. at 265, 143 S. Ct. at 1623. For Indian children who do not live on a reservation, state and tribal courts exercise concurrent jurisdiction. *See* 25 U.S.C. § 1911(b); *Haaland*, 599 U.S. at 265–66, 143 S. Ct. at 1623. When a state court adjudicates the termination proceeding, ICWA governs "from start to finish." *Haaland*, 599 U.S. at 266, 143 S. Ct. at 1623.

ICWA requires in Section 1912(f) that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); *Haaland*, 599 U.S. at 266, 143 S. Ct. at 1624. Mother claims that a Texas state court may only make a finding under Section 1912(f) of ICWA—it cannot make both the ICWA finding and termination findings under Section 161.001(b) of the Family Code.

7

**B. Analysis**

Mother does not challenge the sufficiency of the evidence to support the Section 1912(f) ICWA finding. Instead, relying on *In re W.D.H.*, 43 S.W.3d 30 (Tex. App.—Houston [14th Dist.] 2001, pet. denied), Mother argues that it is impossible to apply the standards of the Family Code and ICWA simultaneously to a parental rights termination case.

In *W.D.H.*, the Fourteenth Court of Appeals held that the ICWA termination provisions preempt the Family Code so that a trial court is forbidden in an ICWA case from making Family Code termination findings along with an ICWA Section 1912(f) finding. *Id.* at 35–37. We decline to adopt this "all or nothing" approach.

First, we find *W.D.H.* distinguishable because the trial court in that case failed to make the finding required under Section 1912(f) of ICWA. *Id.* at 33. Here, in addition to making the required Section 161.001(b) findings under the Family Code, the trial court found beyond a reasonable doubt that the Department had "engaged in active efforts to prevent the breakup of an Indian family" and that the "continued custody of [Robert] by a parent is likely to result in serious emotional or physical damage to [him]." Although *W.D.H.* specifically held that *no* Family Code findings were appropriate, *see id.* at 37, we are not convinced that the mere existence of Family Code findings can undermine ICWA's purpose in a case in which termination of

8

parental rights is ably supported by the Section 1912(f) finding specifically required by ICWA itself. [3]

Second, we do not believe that ICWA preempts the Family Code. Congress did not expressly state that it intended to preempt state law by enacting ICWA nor did it intend that ICWA completely occupy the area of child custody determinations. *In re J.J.C.*, 302 S.W.3d 896, 899 (Tex. App.—Waco 2009, no pet.). Therefore, we must presume that Congress did not intend for ICWA to preempt the Family Code. *See R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 691 (Tex. 1992) (op. on reh'g). As the Tyler Court of Appeals has ably explained, "ICWA and the Texas Family Code address similar interests when a child is removed from his or her home because they both seek to protect the best interests of the child and to preserve family stability." *In re K.S.*, 448 S.W.3d 521, 531 (Tex. App.—Tyler 2014, pet. denied). Further, as both statutes seek to preserve the family unit but provide for situations where preservation is impossible, the statutes can be read in harmony with each other. *Id.* at 532–33; *see In re J.L.C.*, 582 S.W.3d 421, 429 (Tex. App.—Amarillo 2018, pet.

---

[3]The Fourteenth Court of Appeals had occasion to revisit its *W.D.H.* decision in *In re C.J.B.*, 681 S.W.3d 778, 785 (Tex. App.—Houston [14th Dist.] 2023, no pet.). Although it adhered to the preemption rationale of *W.D.H.*—despite noting "a 4-to-1 split among Texas courts of appeals on this issue," with *W.D.H.* as the outlier—the court pointed out that, unlike in *W.D.H.*, the trial court had made both ICWA and Family Code findings. *Id.* at 784. The court held that the complaining parent was not actually harmed by the entry of findings under Section 161.001 and that, therefore, any error in entering both sets of findings was not reversible. *Id.* at 785. Similarly, in this case, Mother does not explain how the entry of findings under Section 161.001— in addition to the required ICWA findings—has harmed either her or Robert. *See* Tex. R. App. P. 44.1(a).

9

denied); *S.P. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-17-00698-CV, 2018 WL 1220895, at *2 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.); *In re G.C.*, No. 10-15-00128-CV, 2015 WL 4855888, at *1–2 (Tex. App.—Waco Aug. 13, 2015, no pet.) (mem. op.); *see also W.D.H.*, 43 S.W.3d at 40 (Wittig, J., concurring) (opining that the two statutes can be read in harmony with each other and concluding, "If the heightened Indian standard is met, beyond a reasonable doubt, a factfinder could logically and correctly include *other* aspects of the Family Code as grounds for termination."). As the Tyler Court of Appeals explained in *K.S.*, "Generally, the concurrent application of the family code to proceedings involving Indian children provides additional protection to parents of Indian children because it requires the party seeking termination to prove state and federal grounds before the parent–child relationship may be terminated." *K.S.*, 448 S.W.3d at 533 (holding that "when . . . ICWA applies, both the ICWA and the Texas Family Code grounds for termination must be satisfied"). In other words, while a parent's rights to an Indian child may not be terminated without a Section 1912(f) finding, the existence of that finding does not preclude, and is not inconsistent with, the trial court's also making state-court findings.

Additionally, the Family Code contains a relevant provision that is not found in ICWA—protection of Mother's other children in the event she is found to have engaged in conduct that endangered Robert or if she had relegated him to a dangerous environment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing for termination

10

where "parent–child relationship [was] terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). Here, the trial court's finding under subsection (E) works to protect Mother's potential future children. It would be an odd result for a federal statute to preempt a state statute to *deny* protection to the other children. *See* Note, *A Framework for Preemption Analysis*, 88 Yale L.J. 363, 379 (1978) (discussing the "general rule against the preemption of state laws protecting the vital interests of state citizens" and collecting cases); *see also People In re C.R.W.*, 962 N.W.2d 730, 743 (S.D. 2021) (refusing to find preemption where state statute gives children "higher standard of protection" than ICWA).

Finally, Mother concedes that the trial court made the required Section 1912(f) ICWA finding[4] but argues that it "did not terminate [her] parental rights based on the ICWA standard." This is unsupported by the trial court's termination order. After making the required ICWA finding (and the necessary findings under the Family Code), the trial court's order states, "IT IS ORDERED that the parent–child relationship between [Mother] and [Robert] is terminated." We hold that a rendition of the required ICWA and state-court findings, followed by unequivocal language terminating a parent's rights that is not limited solely to the state-court grounds, is

---

[4]Even if we held that ICWA preempted the Family Code (and we do not), Mother's concession that ICWA has properly been applied to her case obviates any possibility that she was harmed by the entry of Family Code-based findings. *See C.J.B.*, 681 S.W.3d at 785.

sufficient to support a termination under the ICWA standard. We overrule Mother's first point.

## IV. Endangering Conduct and Best Interest Findings

In her second point, Mother challenges—pursuant to the clear and convincing standard—the legal and factual sufficiency of the evidence supporting the predicate conduct and best interest findings made by the trial court as required by the Family Code.[5] Because the endangering-conduct finding could create collateral consequences for Mother's potential future children, we first address that part of her second point. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (requiring appellate review of endangerment findings to assure proper application of collateral consequences).

### A. Legal and Factual Sufficiency Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

---

[5]As we pointed out previously, she does not challenge the sufficiency of the evidence to support the Section 1912(f) ICWA finding. Even if we were to construe Mother's second point as an attempt to challenge the sufficiency of the evidence supporting the ICWA predicate finding applying the beyond-a-reasonable-doubt sufficiency standard, *see K.S.*, 448 S.W.3d at 539 (applying beyond-a-reasonable-doubt standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787 (1979) to sufficiency review of ICWA findings), based upon the evidence we consider hereafter, the trial court's predicate finding meets the higher standard, and we so hold.

Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We give deference to the factfinder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the factfinder resolved any disputed facts in favor of its finding, so long as a reasonable factfinder could do so. *Id.* We disregard any evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but we do not disregard undisputed facts. *Id.*

In evaluating the evidence's factual sufficiency to support termination, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If the factfinder reasonably could form a firm conviction or belief that termination is justified under the relevant subsections, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). But if a factfinder reasonably could not— because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B. Evidence of Endangerment**

In part of her second point, Mother claims that there was both legally and factually insufficient evidence to support the trial court's conduct-endangerment finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). We disagree.

**1. Endangerment Under Subsection (E)**

The trial court granted the termination in part on the grounds listed in subsection (E) of Section 161.001(b)(1). If a trial court's termination is based on subsection (E), an appellate court must review that ground when raised on appeal—even if other grounds would support termination—because, as noted above, a termination for endangering conduct has collateral consequences for the parent's relationship with other children the parent may have in the future. *See id.* § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *N.G.*, 577 S.W.3d at 237 ("[I]f a court of appeals affirms the termination on either [(D) or (E)] grounds, it must provide the details of its analysis.").

Subsection (E) permits termination when the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). The relevant inquiry under subsection (E) is "whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re M.B.*,

No. 02-15-00128-CV, 2015 WL 4380868, at \*12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). However, the parent's conduct need not be directed at the child or actually cause the child injury; "[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone." *M.B.*, 2015 WL 4380868, at \*12. Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department. *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at \*4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *M.B.*, 2015 WL 4380868, at \*12.

Additionally, termination under subsection (E) must be based on more than a single act—there must be a voluntary, deliberate, and conscious course of conduct by the parent. *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Further, imprisonment alone is insufficient to show a continuing endangering course of conduct, but if all the evidence—including imprisonment—proves a course of conduct that endangers the child, then a finding under subsection (E) is appropriate. *Id.* at 743; *see In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.) (holding it is not necessary to show that imprisonment was a result of a course of conduct endangering the child; it is only necessary to show that incarceration was part of a course of conduct endangering the child).

15

**2. Sufficient Evidence of Endangering Conduct**

Mother's interactions with the Department did not begin with Robert's birth.[6] Schofield was Mother's caseworker assigned to look after the welfare of an older sibling, D.T. That case was still pending at the time of Robert's birth. Mother's issues with substance abuse were described as "lengthy." Specifically, Schofield testified that Mother's use of benzodiazepines had been a problem in D.T.'s case. Naturally, Schofield was concerned when both Mother and Robert tested positive for benzodiazepines at Robert's birth.

Mother later sent a photograph to her caseworker indicating that she may have had a valid prescription for benzodiazepines at the time in question. But during a discussion with Schofield concerning D.T.'s case, Mother had specifically told her that—because of her history of benzodiazepine abuse—she would not seek to obtain another prescription for it. This gave the Department obvious concern both for Mother's continued possible abuse of the drug and for her general honesty about her substance abuse issues. *See In re A.S.*, No. 12-16-00104-CV, 2016 WL 5827941, at *6 (Tex. App.—Tyler Sept. 30, 2016, no pet.) (mem. op.) (holding that refusal to admit problems with prescription drugs relevant to conduct-endangerment analysis).

In addition, Mother failed to complete substance abuse counseling services and had not taken a drug test since February 2023. From this, "the trial court could infer . . . that Mother's test results would have been positive if she had submitted to

---

[6]The current matter represents Mother's seventh case with the Department.

16

testing" on the missed occasions. *See In re A.O.*, No. 05-21-00789-CV, 2022 WL 620631, at *7 (Tex. App.—Dallas Mar. 3, 2022, pet. denied) (mem. op.). The trial court could have rationally regarded Mother's refusal to completely disengage from prescription drug use—despite her history of prescription drug abuse—as conduct that endangered Robert's physical and emotional well-being.

Also, Mother's criminal history could have justifiably given the trial court reason to believe that Mother's conduct endangered Robert's well-being. During the pendency of this case, Mother pleaded guilty to theft of property (less than $2,500) and theft of a firearm. Mother received a sentence of two years in state jail (probated) for the former offense and four years' deferred adjudication probation for the latter. But Mother also committed a new theft after her two guilty pleas, a theft that led the trial court to adjudicate her guilt and revoke her probation. At the time of the termination trial, Mother was in jail and had been for over a month.

Evidence of incarceration and its effect on a parent's ability to parent may establish an endangering course of conduct. *In re J.B.*, No. 02-22-00384-CV, 2023 WL 1859766, at *9 (Tex. App.—Fort Worth Feb. 9, 2023, pet. denied) (mem. op.); *see In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g en banc) ("When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure her safety and well-being, then such incarceration can be a part of a course of continuing conduct."). Mother's insistence on continuing to engage in criminal conduct—even to the extent of committing theft

during the pendency of her parental rights case—demonstrates that she has "not learned how to avoid situations that lend themselves to arrests and indictments." *In re A.W.*, No. 02-18-00147-CV, 2018 WL 5074770, at *12 (Tex. App.—Fort Worth Oct. 18, 2018, pet. denied). Further, it is no help to Robert that the offenses committed by Mother were minor in nature. *See In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *15 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.) ("Furthermore, even non-violent, misdemeanor offenses, and arrests for criminal conduct that do not result in conviction will support a finding of endangerment.").

The trial court, as the factfinder, was the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Viewing the evidence in the light most favorable to the trial court's endangering-conduct finding, we conclude that a reasonable factfinder could form a firm belief or conviction that the finding is true. *See In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Likewise, having performed an exacting review of the entire record, we conclude that the evidence is factually sufficient to support the trial court's conduct-endangerment finding. *See A.B.*, 437 S.W.3d at 500. Accordingly, we overrule the endangering-conduct sufficiency portion of Mother's second point.[7]

---

[7]Mother also complains the evidence is legally and factually insufficient to support the trial court's finding under subsection (O) (failing to complete service plan) of Family Code Section 161.001(b)(1). Because we hold the evidence to be legally and factually sufficient under subsection (E), we will not address her challenge to the sufficiency of the evidence under subsection (O). *See In re D.D.G.*, 423 S.W.3d 468, 475 (Tex. App.—Fort Worth 2014, no pet.).

## C. Best Interest

### 1. Best Interest Standard

Although we generally presume that keeping a child with a parent is in his best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of the child's best interest may be the same evidence that is probative of a subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- his emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

**2. Sufficient Evidence That Termination is in Robert's Best Interest**

"A factfinder can give 'great weight' to evidence of a parent's drug use, which supports a finding that termination is in the [child's] best interest." *In re T.N.J.J.*, No. 04-19-00228-CV, 2019 WL 6333470, at *5 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.). As previously described, Mother had a history of drug abuse that she either could not or would not address through treatment. Even though Mother had explained to Schofield before Robert was born that—because of her past history—she would decline to be prescribed benzodiazepine, she still obtained a prescription and continued to take the pills. Mother attended intensive outpatient rehabilitation sporadically but stopped sending proof of attendance to the Department in February 2023. She was eventually unsuccessfully discharged from the

program a few months later. Mother's previous caseworker testified that if Robert were returned to Mother, he would probably be subject to serious physical danger because of her continued drug use. *See In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parental drug abuse reflects poor judgment and may be a factor to consider in analyzing a child's best interest).

The trial court could have reasonably determined that Mother's history of drug abuse and unwillingness to effect positive changes in her life was relevant to a best interest finding. *See In re K.M.L.H.*, No. 04-13-00779-CV, 2014 WL 1243080, at *5 (Tex. App.—San Antonio Mar. 26, 2014, no pet.) (mem. op.) (explaining trial court could have considered testimony describing parent as unwilling to participate in drug treatment services in best interest analysis).

Children need long-term safety and stability; providing for a child's physical and emotional needs is of paramount importance. *See* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."). There was no evidence that Mother could provide stability for Robert. Mother's continued drug use, incarceration, and inability to hold a job represented barriers to Robert's safety and stability. Schofield testified that in her opinion, Mother had failed to provide a safe and stable home for Robert.

By contrast, Robert had thrived in his placement with the Sandersons and had mentally and emotionally progressed as was appropriate for a one-year-old. The

21

Sandersons also planned to adopt Robert. Mrs. Sanderson stayed with Robert all day, keeping his day full of activities. The Sandersons also made sure that Robert maintained a relationship with his other grandparents and his siblings. *See In re A.F.*, No. 04-20-00216-CV, 2020 WL 6928390, at *4 (Tex. App.—San Antonio Nov. 25, 2020, no pet.) (mem. op.) (taking into account evidence showing children were thriving in foster placement in best interest analysis); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam) (affirming trial court's finding that termination was in child's best interest where child thrived in foster care).

The evidence also showed that Mother failed to complete all of the tasks in the court-ordered service plan. This is also relevant to a best interest finding. *See E.C.R.*, 402 S.W.3d at 249 (holding that failure to complete court-ordered services can support best interest finding).

We hold that the evidence was legally and factually sufficient under the clear and convincing standard of the Family Code to sustain the finding that terminating Mother's parental rights to Robert was in Robert's best interest. We overrule the dispositive parts of Mother's second point.

## V. Conclusion

Having overruled Mother's dispositive complaints, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: March 21, 2024